# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

RANDALL COOK,                                    Case No. 1:19-cv-1068

        Plaintiff,                              Black, J.
                                                 Bowman, M.J.

   v.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION

Plaintiff Randall Cook filed this Social Security appeal in order to challenge the Defendant's finding that he is not disabled.  *See* 42 U.S.C. §405(g).  Proceeding through counsel, Plaintiff presents two claims of error for this Court's review.  As explained below, I conclude that the ALJ's finding of non-disability should be AFFIRMED, because it is supported by substantial evidence in the record as a whole.

### I.  Summary of Administrative Record

In August 2016, Plaintiff filed new applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI"), alleging disability beginning on February 23, 2016, the day after a prior adverse decision.[1]  In his applications, Plaintiff alleged disability based upon spinal fractures, major depression and/or bipolar disorder, degenerative disc disease, and hemorrhoids.  (Tr. 217, 375).  Through counsel at an evidentiary hearing in 2018, Plaintiff additionally argued that arthritis in his right shoulder

_____

[1]Plaintiff initially alleged a disability onset date of December 13, 2013, but subsequently amended his applications to correspond with the February 22, 2016 denial date.

1

A/C joint constitutes an additional severe impairment.  Plaintiff has a limited 9th grade education, and worked as a boat buffer, spray paint helper, and sandblaster prior to his alleged disability onset date.  There is no dispute that Plaintiff is unable to perform any of his past work and has not worked since his disability onset date.  (Tr. 28).  He remained insured, for purposes of DIB, through December 31, 2018.

Plaintiff's applications were denied initially and upon reconsideration, leading him to request an evidentiary hearing.  On July 23, 2019, Plaintiff appeared with counsel and gave testimony before Administrative Law Judge ("ALJ") Renita Bivins; a vocational expert also testified.  (Tr. 65-129).  Plaintiff was 44 years old on the alleged disability onset date, and remained a "younger individual" at the time of the ALJ's August 30, 2019 adverse decision.  (*See* Tr. 28).  In her decision, the ALJ determined that Plaintiff has the following severe impairments:  degenerative disc disease, spine disorder, carpal tunnel syndrome, and depressive, bipolar related disorder.  (Tr. 18).  In addition, she noted "non[-]severe" impairments of asthma/chronic obstructive pulmonary disease, erectile dysfunction, hemorrhoids, tobacco use and opioid dependence.  (*Id.*)  Plaintiff does not dispute the ALJ's determination that none of his impairments, either alone or in combination, met or medically equaled any Listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, such that Plaintiff would be entitled to a presumption of disability.

In contrast to the February 2016 adverse decision, in which the ALJ determined that Plaintiff could perform *all* light work except for a single limitation to only "frequently climb ramps or stairs," (Tr. 138), ALJ Bivins determined that Plaintiff had numerous limitations based upon "new and material evidence" submitted after that prior decision.  (Tr. 15, citing *Drummond v. Com'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997)).  The ALJ determined that Plaintiff still retains the residual functional capacity ("RFC") to perform

2

*some* light work, defined as able to lift/carry up to twenty pounds occasionally and ten pounds frequently, and able to stand and/or walk six hours in a day, and sit six hours in a day, with normal breaks.  (Tr. 20).  However, she added the following non-exertional limitations:

> The claimant can frequently climb ramps and stairs, and frequently balance, stoop, kneel, and crouch; and occasionally climb ladders, ropes, or scaffolds, and occasionally crawl. He can perform frequent bilateral handling and fingering, no forceful pushing/pulling of bilateral hand controls, and avoid concentrated exposure to hazards, such as unprotected heights. He can maintain concentration and attention, and sustain persistence and pace to complete tasks that do not involve strict time pressures and/or strict production demands and fast pace.  He can adapt to a predictable work setting where supervisors are available whenever changes in routine are needed.

(Tr. 20).  Considering Plaintiff's age, education, and RFC, and based on testimony from the vocational expert, the ALJ determined that Plaintiff could still perform a "significant number" of jobs in the national economy, including the representative jobs of merchandise marker, inspector, hand packager, or routing clerk. (Tr. 29). Therefore, the ALJ determined that Plaintiff was not under a disability.  The Appeals Council denied further review, leaving the ALJ's decision as the final decision of the Commissioner.

In his appeal to this Court, Plaintiff first argues that the ALJ erred by failing to find his right shoulder AC joint arthritis to be a "severe" impairment at Step 2.  His second claim of error is that the ALJ erred in determining Plaintiff's RFC in multiple ways,[2] including: (1) by failing to incorporate reaching and/or greater fingering restrictions; (2) by unfairly discounting subjective complaints based upon "boilerplate" language and a misleading pain scale; and (3) by improperly assessing Plaintiff's ability to maintain

---

[2]Plaintiff's five subclaims have been reorganized in this Report and Recommendation.

attention and concentration based upon the ALJ's personal observations and the "daily activities" section of a consultant's report.

## II.  Analysis

### A.  Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability." *See* 42 U.S.C. §1382c(a).  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted).  In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).  If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability.  *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).  As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.... The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts.  If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

4

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits. 20 C.F.R. § 404.1512(a). A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, he suffered an impairment, or combination of impairments, expected to last at least twelve months, that left him unable to perform any job. 42 U.S.C. § 423(d)(1)(A).

**B. Plaintiff's Claims**

**1. Step 2 Error and Plaintiff's Alleged Right Shoulder Arthritis**

Plaintiff first argues that the ALJ erred in failing to consider his right shoulder AC joint arthritis to be a "severe" impairment. Notably, the shoulder impairment was not found to be a "severe" impairment at Step 2 in the prior 2016 decision. Plaintiff has not sought any medical attention for his shoulder since his revised disability onset date of February 23, 2016. Additionally, there is no evidence in the record relating to his shoulder between

5

February 23, 2016 and the date of the current ALJ's decision.[3]  Nevertheless, counsel argued at the hearing that the pre-existing shoulder arthritis constituted a severe impairment.  In this appeal, Plaintiff speculates that the ALJ's failure to include his shoulder impairment at Step 2 "matters… if an individual because of right shoulder joint arthritis would have limitations with respect to reaching."  (Doc. 7 at 11, emphasis original).  He argues that the ALJ erred in dismissing the *possibility* that he had such limitations merely because he had not complained about his shoulder or sought any treatment in recent years.  Plaintiff suggests that "people sometimes just elect to 'live with' a particular medical problem and that fact alone does not *necessarily* mean that the individual does not or would not have functional limitations secondary to that condition." (Doc. 7 at 11-12, emphasis added).

The undersigned finds no reversible error. It was Plaintiff's burden to produce medical evidence to show that he had an impairment, and how that impairment impacts his functioning during the relevant disability period.  *See* 20 C.F.R. § 404.1512(c).  At the hearing, counsel acknowledged the absence of any treatment during the disability period but argued that "there were x-rays several years ago that showed moderate degenerative changes in the right shoulder AC joint.  That doesn't go away."  (Tr. 71; *see also* Doc. 13 at 2, argument that "osteoarthritis is a progressive condition…which only gets worse with time.").  Plaintiff's speculation is insufficient to show error on the record presented.

Although ALJ Bivens determined that Plaintiff had submitted "new and material" evidence sufficient to warrant greater limitations in other areas, there was no such

---

[3]Although records relating to the alleged shoulder impairment were discussed in more detail in the 2016 decision, the 2016 decision found no shoulder-related limitations to be supported by the record.  (*See* Tr. 139).

evidence submitted with regard to Plaintiff's shoulder.  The shoulder x-ray dates to February 2013 – three years prior to the alleged onset of disability and six and a half years prior to the ALJ's decision.  The mere diagnosis of "moderate" AC joint arthritis on x-ray in 2013 reflects nothing about the level of functional impairment, if any, during the relevant disability period.  *See Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990).

Although Plaintiff's failure to point to relevant evidence during the disability period is dispositive, it is worth pointing out that Step 2 errors rarely require reversal when the ALJ finds at least one "severe" impairment and therefore continues with the remaining steps in the sequential process. That is because in determining a plaintiff's residual functional capacity and ability to work later in the sequential process, the ALJ must consider even the impairments found not to be "severe" at Step 2. *See Maziarz v. Secretary of Health and Human Servs.,* 837 F.2d 240, 244 (6th Cir. 1987); 20 C.F.R. § 404.1520.  In other words, at Steps 4 and 55 an ALJ must "consider the limiting effects of all [the claimant's] impairment(s), even those that are not severe, in determining [the claimant's] residual functional capacity.

> Pain or other symptoms *may* cause a limitation of function beyond that which can be determined on the basis of the anatomical, physiological or psychological abnormalities considered alone; e.g., someone with a low back disorder may be fully capable of the physical demands consistent with those of sustained medium work activity, but another person with the same disorder, because of pain, may not be capable of more than the physical demands consistent with those of light work activity on a sustained basis. In assessing the total limiting effects of your impairment(s) and any related symptoms, we will consider all of the medical and nonmedical evidence….

20 C.F.R. § 404.1545(e) (emphasis added).  Here, the ALJ was not required to include any "reaching" limitations because Plaintiff presented no evidence that would support functional limitations.  Plaintiff testified to shoulder pain that increased when he slept on

7

it, but also testified that the pain was "nothing I can't take my pain medication for and kind of ease the pain." (Tr. 89). Counsel did not elicit testimony concerning any limitations in reaching, and Plaintiff did not testify to any such limitations.

Still, Plaintiff insists that on the record presented, the ALJ's failure to include the shoulder impairment in a short list of "non-severe" impairments at Step 2, (*see* Tr. 18), is significant, because it suggests the ALJ failed to consider the alleged impairment at all. (*See* Doc. 13 at 1, arguing that "she did not consider it at all," emphasis original). However, the ALJ's list of non-severe impairments referred to those supported by "medical records." None of the most relevant medical records (dated *within* the disability period) referred to a shoulder impairment. More importantly, the record sharply contradicts Plaintiff's assertion that the ALJ ignored his allegation of a shoulder impairment. The ALJ explicitly addressed Plaintiff's allegations of disabling shoulder pain, noting "that he has not had treatment for his shoulder since 2016." (Tr. 21; *see also id.*, restating Plaintiff's testimony including his report of "right shoulder pain rated at 4, depending on the activity he engages in or if he sleeps on it."). The ALJ also explicitly and repeatedly pointed out the absence of records to substantiate either a right shoulder impairment or any functional limitations related to the shoulder. (*See* Tr. 24, summarizing March 2019 examination record that assessed multiple issues including lumbar pain, but with "no mention or report of right shoulder complaints or deficits."; *id.*, summary of May 2019 record that assessed "normal musculoskeletal range of motion" and "again no mention or report of right shoulder complaints or deficits."; Tr. 25, summary of May 2019 exam for thoracic and lumbar back pain that included "normal cervical and thoracic range of motion, limited lumbar extension, normal lumbar flexion, [and] lumbar tenderness, but contained "no mention or report of right shoulder complaints or deficits."; Tr. 26,

discussing July 2019 follow-up record that found normal musculoskeletal range of motion and again noted "no mention of right shoulder complaints or deficits.").

### 2. The ALJ's RFC is Substantially Supported

As discussed above, Plaintiff's first claim of "Step 2" error in failing to find his shoulder arthritis to be a "severe" impairment also touches upon the ALJ's RFC findings. Plaintiff's second assignment of error more directly attacks the ALJ's RFC determination in multiple ways. Because the RFC is substantially supported by the record as a whole, I find no reversible error.

#### a. Reaching and/or Fingering Limitations

Repeating his assertion that he suffers from a severe shoulder impairment, Plaintiff argues that "*it stands to reason* that an individual with moderate AC joint arthritis is necessarily going to have at least some degree of limitation" in reaching with his right arm, contrary to the opinion of the agency consulting opinion who specifically opined that Plaintiff's ability to reach was "unlimited." (Tr. 192, emphasis added). Plaintiff suggests that the consultant might have overlooked the February 2013 x-ray report that showed arthritis in his right shoulder AC joint. For the reasons stated, the ALJ's RFC finding of "unlimited" reaching limitations is substantially supported by both the consulting physicians' opinions and the record as a whole.

Pointing to his diagnosis of carpal tunnel syndrome, Plaintiff further argues that the ALJ erred when she determined that he could use his hands "frequently" for bilateral handling and fingering. Plaintiff testified that he was last treated for carpal tunnel by Dr. Walquist back in 2016, but that he had recently scheduled a return visit to Dr. Walquist, to take place after the July 2019 hearing. (Tr. 83). In fact, the adverse 2016 decision included no handling or fingering limitations at all, (Tr. 138), and neither Dr. Walquist nor

any other physician opined that Plaintiff would have greater handling or fingering limitations.  Without citing any new evidence of record, Plaintiff criticizes the 2019 decision for not including greater limitations.  Again, I find no error.

The ALJ acknowledged an April 2016 electromyography/nerve conduction stud that showed "mild to moderate right carpal tunnel syndrome and borderline left carpal tunnel syndrome" followed by "a significant gap" in any treatment for that condition.  (Tr. 22).  The ALJ also discussed a January 2017 examination of Plaintiff's hands that was essentially normal.  (Tr. 23).  With respect to handling and fingering, the ALJ's RFC determination is well-supported by the opinion of consulting physician Dr. Delphia that Plaintiff would have some manipulative limitations, but that he could still perform "frequent" handling and fingering, with no forceful pushing or pulling of bilateral hand controls.  (Tr. 27).

Plaintiff criticizes the adoption of agency opinions on grounds that one physician was trained as a family practice physician and the other as an internist.  However, the evaluation of medical opinions includes consideration of many factors, including but not limited to a physician's specialization.  An ALJ is not required to perform an exhaustive, step-by-step analysis of each factor in weighing medical source opinions.  *See Biestek v. Com'r of Soc. Sec.*, 880 F.3d 778, 785 (6th Cir. 2017) (*aff'd on other grounds*, 139 S. Ct. 1148).  Included among the relevant factors to be considered is familiarity with SSA programs.  *See* 20 C.F.R. § 404.1527(c)(2)-(6).  Here, the fact that the agency physicians were board certified in family practice and in internal medicine does not diminish the fact that under SSR 17-2p, 2017 WL 3928306 at *3 (March 27, 2017), they remained "highly qualified medical sources who are also experts in the evaluation of medical issues in disability claims under the [Social Security] Act."  *Id.*; *see also*, SSR 96–6p, 1996 WL

10

374180, at *2 (July 2, 1996) (same).  In short, the handling and fingering limitations are supported by substantial evidence, in contrast with Plaintiff's wholly unsupported opinion that his carpal tunnel diagnosis entitles him to greater limitations.

Also unpersuasive is Plaintiff's suggestion that the ALJ should have held the record open for an indefinite period to allow him to pursue a new diagnosis that might have supported additional handling or fingering restrictions.  Plaintiff points to a medical note from his primary care nurse practitioner dated July 17, 2019 that found "nodules" at the DIP joints (Tr. 767), as well as an abnormal rheumatoid factor (Tr. 768),[4] which he asserts "suggested that… Mr. Cook might be suffering from rheumatoid arthritis affecting his hands."  (Doc. 7 at 20).  The ALJ acknowledged the exam record, (Tr. 24-25, citing Tr. 756).  However, she also referenced a record that found normal range of motion in both wrists, with no tenderness and no bony tenderness.  (*Id.*)

Plaintiff now argues that the ALJ should have held the record open "to allow Mr. Cook time to have the rheumatology consultation" recommended by the CNP.  (*Id.* at 21).  However, Plaintiff had just been referred for a consultation, and his insured status had expired months prior, in December 2018.  Arguably, Plaintiff waived the argument by failing to request that the ALJ hold the record open for a rheumatology consult.  When the ALJ suggested holding the record open for only a short period, counsel affirmatively responded: "That should be fine." (Tr. 73).  Regardless, Plaintiff has offered no evidence (either before the Appeals Council or before this Court) to suggest that he has been diagnosed with rheumatoid arthritis, or that he has functional limitations from that condition. The ALJ reviewed the only post-hearing evidence submitted, noting that

---

[4]The rheumatoid factor test showed 15 IU/mL, 1 point above normal.  (Tr. 756, 759).

Plaintiff reported no joint swelling or weakness, that nothing aggravated his symptoms, and that he had tried no treatment.  (Tr. 25-26, 753).

### b.  The ALJ's Evaluation of Plaintiff's Subjective Complaints

Using circular reasoning, Plaintiff generally complains that the ALJ improperly discounted Plaintiff's subjective complaints because the ALJ found he retained the RFC to perform light work despite his allegations.  More specifically, Plaintiff argues that the ALJ erred by using some "boilerplate" language and by using a misleading pain scale. The undersigned begins with Plaintiff's general contention, which appears to assume that chronic pain precludes the ability to sustain work.

Not all pain is "disabling," and many non-disability determinations are affirmed notwithstanding evidence to support some level of chronic pain.  *See generally*, *Blacha v. Sec'y of HHS*, 927 F.2d 228, 231 (6th Cir. 1990) (affirming ALJ's determination that pain from nerve root compression due to herniated disc and degenerative changes did not preclude all work).  In fact, many claimants allege disability due to pain.[5]  Pain alone can be disabling, but it remains the responsibility of the ALJ to assess whether a plaintiff's subjective reports are in fact disabling.  This assessment, formerly referred to as the "credibility" determination in SSR 96-7p, was clarified in SSR 16-3p to remove the word "credibility" and refocus the ALJ's attention on the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." SSR 16-3p, 2017 WL 5180304 at *2 (October 25, 2017). The new ruling emphasizes that "our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court

_____

[5]Here, notwithstanding his argument to this Court, Plaintiff did not testify before the ALJ that his pain level precluded all work.

litigation." *See id.* at *11.  Under SSR 16-3p, an ALJ is to consider all of the evidence in the record in order to evaluate the limiting effects of a plaintiff's symptoms, including the following factors:

1.  Daily activities;

2. The location, duration, frequency, and intensity of pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

*Id.*, 2017 WL 5180304, at *7–8; *see also* 20 C.F.R. §§ 404.1529(c), 416.929(c) and former SSR 96–7p.

Despite clarifying the basis for the analysis of subjective complaints and corresponding elimination of the term "credibility" from the text in order to avoid "character analysis," SSR 16-3p was not intended to substantially change existing law. *See Banks v. Com'r of Soc. Sec.*, Case No. 2:18-cv-38, 2018 WL 6060449 at *5 (S.D. Ohio Nov. 20, 2018) (quoting explicit language in SSR 16-3p stating intention to "clarify" and not to substantially "change" existing SSR 96-7p), adopted at 2019 WL 187914 (S.D. Ohio Jan. 14, 2019). Thus, it remains the province of the ALJ and not the reviewing court, to assess the consistency of subjective complaints about the impact of a claimant's symptoms with the record as a whole. *See generally Rogers v. Com'r*, 486 F.3d 234, 247 (6th Cir. 2007).

13

The elimination of the word "credibility" from SSR 16-3p can be semantically awkward in applying prior case law, insofar as virtually all of the prior case law uses the catchphrase "credibility determination." Nevertheless, the essence of the regulatory framework remains unchanged. Therefore, courts agree that the prior case law remains fully applicable to the renamed "consistency determination" under SSR 16-3p, with few exceptions. *See Duty v. Com'r of Soc. Sec.*, 2018 WL 4442595 at *6 (S.D. Ohio Sept. 18, 2018) ("existing case law controls to the extent it is consistent with the clarification of the rules embodied in SSR 16-3p's clarification.").

Turning to that case law, it is clear that a reversal of the Commissioner's decision based upon error in a credibility/consistency determination requires a particularly strong showing by a plaintiff. Like the ultimate non-disability determination, the assessment of subjective complaints must be supported by substantial evidence, but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Com'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Further, a credibility/consistency determination cannot be disturbed "absent a compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). Thus, it is proper for an ALJ to discount the claimant's testimony where there are inconsistencies and contradictions among the medical records, her testimony, and other evidence. *Warner v. Com'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004).

Having clarified the relevant standards, the undersigned turns to Plaintiff's two more specific arguments concerning the use of "boilerplate" and what Plaintiff maintains was a misleading pain scale.   The undersigned finds the ALJ's analysis to be consistent with the law and substantially supported by the record presented.

### i. Use of "Boilerplate"

Plaintiff complains about the ALJ's use of boilerplate language in finding that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Doc. 7 at 13, quoting Tr. 22). However, there is nothing inherently wrong with an ALJ's use of "boilerplate" language to summarize evidence, and Plaintiff offers no legal authority to the contrary.

The ALJ went well beyond that summation in explaining the inconsistencies she found between the claimant's statements and the medical evidence and other evidence in the record. (Tr. 21-28). For example, the ALJ properly summarized Plaintiff's daily activities, including his ability to prepare simple meals, go out to eat, shop, load the dishwasher, and do laundry including folding and hanging clothes, go to church (for a period of time), spend time with his girlfriend, go to friends' houses to get marijuana (until January 2019) and watch TV. (Tr. 21-22). The ALJ reviewed the conservative nature of his back treatment (and lack of treatment for his shoulder since 2016), two significant gaps in medical treatment, and multiple medical records that documented relatively normal findings and/or that appeared inconsistent with Plaintiff's claim of disability. (Tr. 22-26). She noted inconsistencies in Plaintiff's own testimony, such as his testimony that he does not presently go to friends' houses or associate with people, but that he "knows a lot of people," that friends or neighbors help him with the trash and helped him relocate, and that until January 2019, he would stop by friends' houses to smoke marijuana and friends would visit him. (Tr. 26). This analysis is both consistent with SSR 16-3p and is substantially supported by the record as a whole.

### ii.     The ALJ's Pain Scale

Plaintiff further complains that the ALJ employed a "pain scale" that was "clearly designed to elicit reported pain scores significantly lower than those that claimants would normally give when asked to rate their pain by their physician." (*Id.* at 13).  He maintains that it was "disingenuous" for the ALJ to so define the pain scale and then to discount Plaintiff's pain level as a result.  (*Id.*)  Specifically, Plaintiff complains about the following colloquy in which the ALJ defined a numerical pain scale as follows, before asking Plaintiff to assess his pain using that scale:

> ALJ Q.  – ten feels like a part of your body's been amputated, the worst possible pain you can imagine.
>         * * *
>
> Q.  Nine, your pain is such that you feel like you need to be in the hospital.
> * * *
>
> Q. Eight, you need an ambulance.  Seven, you need[] somebody to drive you to the emergency room.  Six, you feel like you need to drive yourself to the emergency room if you had your driver[']s license.
> * * *
>
> Q. Five, you take your pain medication.  It takes the edge off for you.  Three/four, you take your medication, it'll give you some relief, all the way down to a zero.  On an average day since 2016, please rate your mid back pain.

(Tr. 88-89).  In response to the ALJ's query, Plaintiff rated his back pain as "Five, sometimes six," and his shoulder pain as "Less so probably 4 to 5."  (Tr. 89).  Plaintiff went on to explain:

> A. You know, just if I lay on it wrong, it bothers it to really, really bad.  You know how it is when you're sleeping, you don't intend to sleep on the side that you want to sleep on.  It's the side that you tend to sleep on and it affects me, whenever I wake up, it's in extreme pain.  Which at that point, it is a six or a seven.  But It's nothing I can't take my pain medication for and kind of ease the pain.

(*Id.* at 89).

The undersigned finds no reversible error, in part because Plaintiff fails to explain how the ALJ "mischaracterized" the evidence. Plaintiff's responses - using the pain scale provided - suggested that much of the time his pain level was at a level that required him to take pain medication, and sometimes rose to the level where he would want to seek emergency treatment. However, the only time in which he sought emergency treatment for pain was in May 2018 when he presented for lower back pain after lifting a mattress. Following ER treatment, he reported improvement in his symptoms. (Tr. 23). Plaintiff's own testimony confirmed that even at the highest pain levels, his pain medication was effective to "kind of ease the pain."

### c. The ALJ's Personal Observations and Reliance on Consultative Opinion Evidence Concerning Focus, Attention and Concentration

Finally, Plaintiff finds fault with the ALJ's use of her own "observations" and reliance upon a consulting psychologist's report to support the RFC determination that Plaintiff could maintain sufficient focus, attention and concentration to sustain full-time employment. (*See* Tr. 26). Plaintiff argues that his limited ability to focus, attend and concentrate is "one of the biggest issues in this case," and that the ALJ erred by not finding either "marked" or "extreme" limitation in that area. (Doc. 7 at 15-16). However, Plaintiff does not cite to any specific evidence to support either "marked" or "extreme" limitations.

In the course of her determination of whether Plaintiff's mental impairment satisfied the "paragraph B" criteria in order to meet or equal a Listing, the ALJ found "moderate" limitations in "concentrating, persisting or maintaining pace." (Tr. 19-20). The paragraph B criteria are used only to rate the severity of a mental health impairment at Steps 2 and 3 of the sequential analysis; they do not describe work-related limitations, which requires a more detailed assessment. Under paragraph B, Plaintiff was found to have no limitation

17

in "understanding, remembering or applying information," and only a "mild limitation" in interacting with others. Plaintiff does not argue error with respect to those two areas, nor does he suggest that he met the Listing criteria, which would have required at least one "extreme" limitation or two "marked" limitations under paragraph B.

Moving forward with the more detailed RFC assessment, the ALJ found that Plaintiff could "maintain concentration and attention, and sustain persistence and pace to complete tasks that do not involve strict time pressures and/or strict production demands and fast pace." (Tr. 20). In assessing that mental RFC, the ALJ noted that Plaintiff had not taken mental health medication since 2016 or 2017, does not have any problems getting along with family, friends, and neighbors, and testified that he "does not do anything during the day that requires focus or concentration but …will watch television for 20-30 minutes." (Tr. 21). The ALJ specifically asked Plaintiff if he had any particular issues with memory, attention and concentration, and Plaintiff responded by providing nothing more than "examples describing a normal part of aging and subtle memory difficulties similar to those that others in the population generally experience." (Tr. 21).

The ALJ also cited to the examination performed by Jessica Twehues, Psy.D. Dr. Twehues found that Plaintiff had "clear speech, logical and goal-directed thoughts, adequate eye contact, alert and responsive, focused well in conversation, adequate recent and remote recall, adequate insight, and sufficient judgment." (Tr. 22, citing Tr. 526-533). The ALJ gave her opinions "some weight." (Tr. 28). Plaintiff argues that the ALJ's reliance on Dr. Twehues's report was error, but fails to point to any contrary opinion evidence or to offer a reasoned basis for rejecting her opinions.[6] Dr. Twehues specifically

---

[6]Plaintiff argues that the ALJ relied too heavily on the "'Activities Of Daily Living' section" of the report in assessing "moderate" limitations in the paragraph B area. As previously explained, the paragraph B

opined that Plaintiff would have no functional limitations in understanding, remembering and carrying out instructions, and only "mild" difficulties in sustaining focus for "prolonged" periods of time – an opinion that is consistent with the RFC as determined. (Tr. 28). The ALJ also cited to two non-examining agency mental health consultants, Drs. Rivera and Tangeman, who also found only "moderate" limitations in "concentrating, persisting, or maintaining pace," with functional limitations consistent with the mental RFC as determined. (Tr. 27).

In addition to relying upon three consulting opinions, the ALJ thoroughly reviewed the medical record, including Plaintiff's mental health treatment records from the date he began treatment, in February 2019. Plaintiff's mental status examination at that time was within normal limits. (Tr. 23-24). The ALJ cited multiple physical examination records that similarly referenced Plaintiff's normal mental status, normal behavior and normal thought content. (Tr. 24-25). Plaintiff fails to direct this Court to any medical records or opinion evidence that would support greater mental limitations than determined.

Last, the ALJ referred to her own observations. Although Plaintiff is highly critical of this portion of the ALJ's analysis, the undersigned finds no error. The ALJ appropriately stated that her observations did not "alone" constitute substantial evidence, but that they could be considered "when combined with other inconsistencies present in the record." (Tr. 26). The ALJ stated:

> [T]he claimant was attentive to questioning, able to sustain conversation and answer questions with meaningful responses. He was able to maintain his train of thought while responding to questions and recalling important details of his personal, medical and work history from 2016 to the present…. [H]e did not display an apprehensive facial expression, lack of focus or loss of memory, no low energy such as yaw[n]ing, or drifting…. While the

---

analysis differs from the assessment of mental RFC. In assessing functional limitations, the ALJ cited numerous portions of Dr. Twehues's report and the opinion of two other consultants, (*see* Tr. 23, 27-28).

> hearing was short-lived and is not considered a conclusive indicator of the claimant's overall level of pain on a day-to-day basis or mental functioning, these observations…are given some slight weight in an evidence-based analysis of the administrative record to determine whether the nature, intensity, frequency, or severity of …allegations and symptoms affect his ability to work and in reaching the [RFC]. However, it is emphasized that this observation is only one among many being relied on in reaching a conclusion regarding the claimant's allegations and the [RFC].

(Tr. 26). Plaintiff invites this Court to disregard the statements of the ALJ about the "slight" weight she gave to her observations, and instead assume that the ALJ unfairly used her observations as "a significant factor in her decision." (Doc. 7 at 14). Absent some evidence to set aside the ALJ's explicit analysis and assume some nefarious intention to deny disability benefits regardless of the law, this Court declines Plaintiff's invitation.

Finally, citing general testimony by the VE that an individual performing unskilled work who was "off-task" at a rate of 13% would be precluded from work, Plaintiff argues that the ALJ erred by failing to find that his functional limitations would render him unable to stay on task at a sufficient rate to sustain employment. (Doc. 13 at 4-5). However, Plaintiff offers no evidence whatsoever to support his assertion that he suffered from such severe functional limitations in his ability to maintain focus, attention and concentration. For the reasons explained above, even if the ALJ discounted her own observations *entirely*, the medical records (including both mental health and physical examination records cited by the ALJ), the medical opinion evidence, and other evidence in the record (including some of Plaintiff's own testimony) easily provide "substantial evidence" to support the mental RFC as determined.

### III. Conclusion and Recommendation

For the reasons explained herein, **IT IS RECOMMENDED THAT** Defendant's decision be **AFFIRMED** as supported by substantial evidence, and that this case be **CLOSED.**

_/s Stephanie K. Bowman_
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

RANDALL COOK,                                    Case No. 1:19-cv-1068

          Plaintiff,                             Black, J.
                                                 Bowman, M.J.
     v.


COMMISSIONER OF SOCIAL SECURITY,

          Defendant.


**NOTICE**

          Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).